## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>P.O. Box 11374<br>Portland, OR 97211<br><br>          Plaintiff,<br><br>v.<br><br>U.S. FISH AND WILDLIFE SERVICE,<br>1849 C Street NW<br>Washington, D.C. 20240,<br><br>DEB HAALAND, in her official capacity as<br>Secretary of the U.S. Department of the Interior,<br>1849 C Street NW<br>Washington, D.C. 20240,<br><br>          *and*<br><br>MARTHA WILLIAMS, in her official capacity<br>as Director of the U.S. Fish and Wildlife Service,<br>1849 C Street NW<br>Washington, D.C. 20240<br><br>          Defendants. | Case No._____<br><br><br>**COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Plaintiff Center for Biological Diversity ("Center") challenges the unlawful

decision of the U.S. Fish and Wildlife Service ("Service") to deny Endangered Species Act

("ESA") protections to the striped newt (*Notophthalmus perstriatus*) ("newt"). 83 Fed. Reg.

65133 (Dec. 19, 2018) ("not-warranted finding"). Defendants' not-warranted finding violated

their mandatory duties under the ESA, 16 U.S.C. § 1533, and deprives the newt of critical

protections that are necessary to ensure its continued survival and recovery.

1

2.      The striped newt is a striking and rare, pond-breeding salamander that reaches two to four inches in length. Adult newts have a yellow belly and are olive green or brown with red to orange striping, while hatchlings are tan to greenish brown with a dark line that extends from the snout to their bushy external gills.


Photo: Kevin Enge (FWC)

3.      The newt occurs only in north-central Florida and southern Georgia in longleaf pine forests, sandhills, and xeric hammocks. The species relies on both seasonal wetlands and suitable upland habitats to complete its complex lifecycle and is vulnerable to threats in both environments.

4.      Newt populations are split across two climatically distinct regions. Genetic exchange between the two regions is minimal or nonexistent due to the fragmentation of upland habitat that renders long-distance dispersal impossible. As a result, each region is considered an "evolutionarily significant unit" ("ESU").

5.      The species is highly imperiled in both regions due to a multitude of threats, including logging, agriculture, fire suppression, urbanization, climate change, disease, vehicle strikes, recreational activities, and the extinction risk inherent to small, isolated populations. The newt has declined precipitously across its range in response to these threats, with the

eastern ESU now containing around 100 extant ponds, and the western ESU containing just seven.

6.      Sixteen years ago, on July 15, 2008, the Coastal Plains Institute and Land Conservancy, now the Coastal Plains Institute, petitioned the Service to list the newt as a threatened or endangered species under the ESA. On June 7, 2011, the Service published a "warranted but precluded" finding for the species, meaning while it found the newt warranted listing as a threatened or endangered species, its listing was precluded by those of higher priority. 76 Fed. Reg. 32911 (June 7, 2011).

7.      The Service conducted annual reviews of the newt's candidate status in 2012, 2013, 2014, 2015, and 2016, each time determining that the species still warranted listing. *See* 77 Fed. Reg. 70019–20 (Nov. 21, 2012), 78 Fed. Reg. 70124–25 (Nov. 22, 2013), 79 Fed. Reg. 72467 (Dec. 5, 2014), 80 Fed. Reg. 80597 (Dec. 24, 2015), 81 Fed. Reg. 87257 (Dec. 2, 2016). Then, on December 19, 2018, the Service suddenly reversed course and found that the newt does not warrant listing, removing it from the candidate list. 83 Fed. Reg. 65133 (Dec. 19, 2018).

8.      In finding that the striped newt is not threatened or endangered, the Service flouted the ESA's mandate that the agency rely solely on the best available science when making listing determinations. For example, to support its finding the Service arbitrarily assumed the newt is secure on public lands, disregarded several of the primary threats facing the species, and assumed the best case scenario in the face of uncertainty.

9.      Compounding its errors, the Service produced a flawed analysis to determine whether the species is threatened or endangered in a significant portion of its range—an independent basis for listing the Service is required to analyze. The agency applied the

incorrect statutory standard and ignored the difference in the newt's status between the eastern and western ESUs—the latter of which is nearing global extinction.

10.    For these and additional reasons, the Service's not-warranted finding for the newt fails to follow the best available science, violates the ESA, and is arbitrary and capricious. To remedy these violations the Center seeks an order vacating the Service's not-warranted finding and remanding the matter to the Service to issue a new finding regarding whether the newt warrants protection under the ESA as an endangered or threatened species by a date certain.

## JURISDICTION AND VENUE

11.    Plaintiff brings this action pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which waive Defendants' sovereign immunity.

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. §§ 2201–2202 (declaratory judgments and further relief); 16 U.S.C. § 1540(c) (district court jurisdiction); 16 U.S.C. § 1540 (g)(1)(C) (action arising under the ESA citizen-suit provision); and 5 U.S.C. §§ 702–704 (APA).

13.    Venue is proper in the District of Columbia pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e), as this civil action is brought against an agency of the United States and officers and employees of the United States acting in their official capacities and under the color of legal authority, and because no real property is involved in this action. Plaintiff also maintains an office in this judicial district.

14.    Pursuant to the ESA citizen suit provision, Plaintiff provided the Secretary of the U.S. Department of the Interior, the Director of the Service, and the Service with 60 days'

notice of intent to sue for ESA violations on September 18, 2023, more than 60 days prior to the filing of this Complaint.

## **PARTIES**

15.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national, non-profit conservation organization that works through science, law, and the media to protect imperiled species and their habitats. The Center has more than 79,000 members, including many who live and recreate in the newt's historic range. The Center is headquartered in Tucson, Arizona, with offices throughout the United States, including in Florida.

16.    Plaintiff brings this action on behalf of its staff and members who maintain professional, scientific, aesthetic, moral, recreational, and other legally protected interests in the striped newt and its habitat.

17.    For example, one Center member is a conservation biologist who has studied the newt in a professional capacity for about 27 years. This member surveys for newts regularly and spends approximately 30 days per year in their habitat, looking for and photographing the newt and enjoying the ecosystem on which it relies. The member believes the newt has an inherent right to exist and is highly concerned about its rapid decline, as much of the member's life and work has been dedicated to the species' conservation.

18.    The Service's decision to deny ESA protections to the newt has caused Plaintiff's members to suffer a concrete and particularized injury that is actual and imminent. Without the protections provided by listing the newt as an endangered or threatened species pursuant to the ESA, the species will likely continue to decline towards extinction, and Plaintiff's members will continue to suffer injury unless the relief sought in this Complaint is granted.

19.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is a federal agency within the Department of the Interior. The Secretary of the Interior has delegated to the Service the authority to administer the ESA for non-marine species. 50 C.F.R. § 402.01(b). This authority encompasses findings and proposed and final listing determinations for the newt.

20.     Defendant DEB HAALAND is the Secretary of the Interior ("Secretary") and has the ultimate responsibility to administer and implement the provisions of the ESA regarding the newt, and to comply with all other federal laws applicable to the U.S. Department of the Interior. Plaintiff sues Defendant Haaland in her official capacity.

21.     Defendant MARTHA WILLIAMS is the Director of the U.S Fish and Wildlife Service and is charged with ensuring agency decisions comply with the law. Plaintiff sues Defendant Williams in her official capacity.

## STATUTORY AND REGULATORY BACKGROUND

### The Endangered Species Act

22.     The ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The "plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

23.     The statute seeks to "provide a program for the conservation of … endangered species and threatened species" and "to provide a means whereby ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). The ESA requires that "all Federal departments and agencies … seek to conserve endangered

species and threatened species and … utilize their authorities in furtherance of the purposes" of the statute. *Id*. § 1531(c)(1).

24.     The ESA protects imperiled species only if the Service lists them as threatened or endangered. Once a species is listed, they receive numerous substantive protections. For example, section 7 of the ESA requires all federal agencies to ensure that their actions do not "jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of a listed species' "critical habitat." *Id*. § 1536(a)(2). Section 9 of the ESA prohibits, among other things, "any person" from intentionally or incidentally "taking" listed species without a lawful authorization from the Service. *Id*. §§ 1538(a)(1)(B), 1539. Other provisions require the Service to designate "critical habitat" for listed species, *id*. § 1533(a)(3); to "develop and implement" recovery plans for listed species, *id*. § 1533(f); and authorize the Service to make federal funds available to states to assist their efforts to preserve and protect threatened and endangered species. *Id*. § 1535(d).

25.     The ESA defines a "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

26.     The ESA requires the Service to determine whether any species is endangered or threatened because of any of the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. *Id*. § 1533(a)(1).

27.     The Service's determination as to whether existing regulatory mechanisms are inadequate to protect the species pursuant to section 1533(a)(1)(D) is guided in part by its Policy on Evaluation of Conservation Efforts When Making Listing Determinations ("PECE"). 68 Fed. Reg. 15100 (March 28, 2003). The PECE directs that "conservation efforts that are not sufficiently certain to be implemented and effective cannot contribute to a determination that listing is unnecessary or a determination to list as threatened rather than endangered." *Id*. at 15115.

28.     If a species meets the definition of "endangered" or "threatened" because of any one or a combination of these five factors, the Service must list the species. *Id*.; 50 C.F.R. § 424.11(c). In evaluating these factors, the Service must make listing determinations "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

29.     A species is "endangered" when it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

30.     Under this plain language, if the Service concludes that a species is endangered or threatened throughout all of its range, the inquiry ends and the Service must publish a proposed rule to list the species in the Federal Register. *Id*. § 1533(b)(5).  If the Service determines that the species is neither endangered nor threatened throughout all of its range, the ESA then requires the agency to examine whether it is endangered or threatened throughout any *significant portion* of its range.

31.     The ESA does not define what constitutes a "significant portion" of a species' range. In 2014, the Service promulgated a "Final Policy on Interpretation of the Phrase

'Significant Portion of Its Range' in the ESA's Definitions of 'Endangered Species' and "Threatened Species.'" 79 Fed. Reg. 37578 (July 1, 2014) ("SPOR Policy").

32.     The SPOR Policy—portions of which have been judicially overruled—directs the Service to determine whether: (1) the portions may be significant; and (2) the species may be in danger of extinction in those portions or is likely to become so in the foreseeable future. The Service may answer these questions in any order, and if both questions are answered in the affirmative, the agency must list the species as endangered or threatened. If either question is answered in the negative, however, that is the end of the inquiry.

33.     As part of this analysis, the SPOR policy directs the Service to consider whether any threats facing the species are geographically concentrated. However, regardless of whether the Service finds threats to be concentrated in some manner under its 2014 SPOR policy, the ESA requires the agency to determine whether the species' *status* indicates it is threatened or endangered in a significant portion of its range.

34.     The requirement that the Service rely on the "best scientific and commercial data *available*," 16 U.S.C. § 1533(b)(1)(A) (emphasis added), means that the Service must act based on the science available to the agency, and cannot dismiss threats to or refuse to list a species based on uncertainty alone. Congress' intention in requiring the Service to list a species based on the best scientific data available, instead of requiring scientific certainty, was for the Service to act and provide ESA protections to imperiled species before they stood on the brink of extinction and beyond any likely hope of recovery. *See* H.R. Rep. No. 412, 93d Cong., 1st Sess. 5 (1973) ("In the past, little action was taken until the situation became critical and the species was dangerously close to total extinction. This legislation provides us with the means of preventive action.") (remarks of Rep. Clausen); *id.* ("By heeding the

warnings of possible extinction today, we will prevent tomorrow's crisis.") (remarks of Rep. Gilman).

35.     Any interested person can initiate the listing process by filing a petition with the Service to list a species as endangered or threatened. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

36.     Upon receiving a petition to list a species, the Service has 90 days to determine whether the petition "presents substantial scientific or commercial information indicating that the potential action may be warranted." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). This determination is known as a "90-day finding."

37.     If the Service makes a positive 90-day finding in response to a petition, it must publish that finding in the Federal Register and proceed with a scientific review of the species' status, known as a "status review." 16 U.S.C. § 1533(b)(3)(A).

38.     Upon completing the status review, and within 12 months of receiving the petition, the Service must publish one of three findings: (1) listing is "warranted"; (2) listing is "not warranted"; or (3) listing is "warranted but precluded" by other proposals for listing species, provided certain circumstances are met. *Id*. § 1533(b)(3)(B).

39.     If the Service issues a finding that listing the species is "warranted," it must publish a proposed rule to list the species as endangered or threatened in the Federal Register. *Id*. § 1533(b)(5). Within one year of publishing a proposed rule to list a species, the Service must issue a final rule listing the species and designating critical habitat for it. *Id*. § 1533(a)(3), (b)(6)(A), (C).

40.     If the Service issues a finding that listing the species is "not warranted," that finding is a final agency action subject to judicial review. *Id.* § 1533(b)(3)(C)(ii).

**The Administrative Procedure Act**

41.    Under the APA's standard of review, a court must hold unlawful and set aside "agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review applies to claims brought under the citizen suit provision of the ESA.

42.    An agency's action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

## FACTUAL BACKGROUND

**The Precipitous Decline of the Striped Newt**

43.    The newt primarily lives in longleaf pine savannas—one of the most biodiverse yet endangered ecosystems in North America. While longleaf pine once dominated the southeast's Coastal Plain, it is estimated that 98 percent of these forests have been lost to logging, agriculture, and development.

44.    Newts require not only intact longleaf pine upland habitat, but also wetland habitat in the form of isolated, seasonal ponds that dry out periodically to kill off any predatory fish that may colonize them. Reproduction occurs in these ponds in late autumn through early spring, and it is important the ponds retain water long enough for larvae to reach the minimum size needed for metamorphosis. Newts are long-lived and, absent drought, return to the same pond each year to breed, usually travelling around 160 meters from their

upland habitats. Upland habitat is also used to access alternative ponds if the original pond is destroyed or has dried up.

45.     Newt ponds are small, can be destroyed without detection, and largely lack protections. By 2005, more than half of Florida's wetlands had been lost—a statistic that likely underestimates the loss of the seasonal isolated wetlands used by newts, which are often too small to be detected by aerial imagery.

46.     Both upland and wetland newt habitats rely on seasonal fire. In a functioning longleaf pine ecosystem, naturally ignited fires in the late spring and early summer ignite in the uplands, then pass through the dry pond basins, reducing organic matter and eliminating encroaching upland plant species. This maintains an open canopy and allows light to reach the forest floor, which supports development of vegetative ground cover that newts need to forage and shelter from predators. Fire suppression disrupts this cycle and leads to the eventual elimination of newt ponds altogether.

47.     Newts live in metapopulations in which dispersal of individuals from neighboring breeding ponds allows for the recolonization of populations after local extinctions. As a result, properties with few breeding ponds are more vulnerable to extirpation from random events such as years of low reproduction, drought, habitat alterations, or disease outbreaks.

48.     Newts are found in two climatically distinct regions—one region includes peninsular Florida and southeastern Georgia, and the other includes northwestern Florida and southwestern Georgia. Genetic exchange between the two regions is minimal or nonexistent due to the fragmentation of upland habitat that renders long-distance dispersal impossible. As a result, each region is considered an "evolutionarily significant unit" ("ESU").

49.     The striped newt is declining precipitously, particularly in the western ESU, and is listed by the states of Florida and Georgia as a threatened species. Its remaining populations are largely isolated and its habitat fragmented, which is likely to prevent recolonization after local extinctions.

50.     Extensive surveys throughout its range indicate that the newt is reliably found in about 100 ponds, primarily in the eastern ESU. The western ESU now consists of just seven ponds—two in Georgia and five in Florida. According to a 2017 range-wide assessment of the newt's status,[1] up to 74 populations could be extirpated across the newt's range.

51.     In the eastern ESU, four out of 14 (about 30%) of the properties that still harbor newt ponds contain only a single, isolated pond. In the western ESU, three out of five (60%) of the properties contain only a single pond. Experts believe the western ESU may be close to global extinction.

52.     In Georgia, where habitat is least protected, newts have been extirpated from 13 ponds, and possibly extirpated from an additional 17 ponds—a potential loss of over 60% of known populations there. Of the 11 ponds that may be extant, nine have had recent detections. All of the properties where these populations are found are isolated, widely separated by unsuitable habitat, and just one area is a metapopulation site with more than one or two ponds.

53.     Five properties are still considered "strongholds" for the species because the newt exists in metapopulations there: Ocala National Forest, Jennings State Forest, Camp Blanding, Ordway-Swisher Biological Station, and Triple N Ranch Wildlife Management Area. All five of these strongholds are in Florida, in the eastern ESU.

---

[1] Farmer, A.L., K. Enge, J. B. Jensen, D. J. Stevenson, and L. Smith. A Range-wide Assessment of the Status and Distribution of the Striped Newt (*Notophthalmus perstriatus*) (2017) ("Farmer et al. (2017)").

54.      Florida's Apalachicola National Forest was once the sole stronghold in the western ESU with 19 ponds, but there is currently just one extant pond there. Repatriation efforts are in progress, but scientists state it is too early to judge their success.

**Remaining Striped Newt Populations Face Significant Ongoing Threats**

55.      Remaining newt populations, including those in stronghold areas, face severe and ongoing threats to their continued existence. These threats arise from silviculture and agriculture; urban development; fire suppression; climate change; disease; off-road vehicles ("ORVs"); a lack of regulatory protections on private and public lands; and the extinction risk associated with having small, isolated populations.

56.      Silviculture and agriculture—land uses that now dominate the Coastal Plain— have resulted in significant loss and fragmentation of newt habitat. In addition to directly destroying wetlands and uplands newts live in, these land uses cause soil and hydrology alterations that cause serious disturbance to remaining isolated wetlands, particularly in Georgia, where very few newt populations still survive. Because of these habitat alterations there is no connectivity between any of the properties containing newts in the western ESU or Georgia, rendering them highly susceptible to extirpation.

57.      Development, which results in the draining of wetland habitat and the destruction of upland habitat, is an ongoing and increasing threat to the newt, particularly on private lands. Urban development also results in increased pumping of ground water to meet drinking water demands, which can dry surface ponds relied upon by the newt. Associated road development fragments newt habitat and results in direct mortality from vehicle strikes.

58.      Most of the newt's remaining habitat is severely threatened by fire suppression, which has been identified as the cause of several extirpations. To provide suitable newt habitat

prescribed burning must occur perpetually, in one-to-three-year cycles, but none of the properties where newts still survive are managed appropriately. Newt extirpations caused by fire suppression have occurred across its range, on both private and public lands.

59.     Recreational ORVs pose a threat to many remaining habitat areas because they kill newts and destroy the littoral zone of newt ponds, i.e., the shallow water at the edge of ponds where much of their invertebrate prey is found and where most adults and newt larvae congregate.

60.     Climate change, a range-wide threat, both directly impacts the newt and exacerbates the effects of other threats, such as habitat loss. Extended droughts resulting from climate change cause breeding ponds to dry before newts have metamorphosed into adults and can also result in the loss of upland vegetation. Habitat fragmentation further increases the threat of drought to newts because when populations are isolated from each other, recolonization cannot occur after local extirpations. Drought is also likely to increase the species' vulnerability to disease outbreaks and can result in major wildfires that are more severe than what even a fire-dependent ecosystem can tolerate.

61.     Abnormally heavy downpours are also predicted as a result of climate change and while they could be beneficial to the maintenance of newt breeding ponds in some cases, they can also result in extirpation if flood waters carry predatory fish to otherwise isolated and naturally fishless ponds. This has occurred at St. Marks National Wildlife Refuge.

62.     Further, sea level rise is expected to inundate newt habitat in coastal areas. Sea level rise will also cause saltwater intrusion, which will kill vegetation relied upon by newts in their upland habitats. Several coastal properties that still contain newts are highly threatened by the combined effects of sea level rise and storm surge, as well as saltwater intrusion.

63.     While the newt still exists at five "stronghold" locations, two of the five—Camp Blanding and Triple N Ranch Wildlife Management area—contain fewer than 10 ponds. Further, the species faces significant threats even on those properties, and there is no connectivity between them.

64.     For instance, due to fire suppression, none of the properties that contain stronghold populations have ecologically appropriate fire regimes.

65.     Every stronghold population is also vulnerable to climate change. Drought has caused extirpations across the newt's range and has caused ponds to dry for extended periods at stronghold locations such as Camp Blanding and Ordway-Swisher Wildlife Management Area.

66.     While newts can recolonize ponds after shorter periods of drought, droughts lasting longer than four years cause population declines even at metapopulation sites; Apalachicola National Forest, for example, was once a stronghold with 19 ponds, but likely as a result of drought, fire suppression, and potentially disease—the risk of which increases during periods of drought—now contains just one newt pond.

67.     Extended droughts will be more severe in the eastern ESU, where every remaining stronghold population is located.

68.     Further, logging occurs on Ocala National Forest, where the most newt ponds remain. There are also extensive ORV trails through Ocala's landscape, and several newt ponds have been degraded as a result. Ocala's populations have not been immune from decline—three metapopulations are likely now extinct, leaving 12 extant.

69.     Populations on public lands outside of the stronghold areas are likewise not secure and have been declining steeply, resulting in numerous extirpations.

70.     For instance, newts have been extirpated from two ponds on the Lochloosa
Wildlife Conservation Area due to silviculture practices; from Guana Tolomato Matanzas
National Estuarine Research Reserve and St. Marks National Wildlife Refuge due to fire
suppression; from the Okefenokee National Wildlife Refuge's Chesser's Island due to
ditching; and from at least one pond at Fort Stewart Military Installation due to fire
suppression and ditching. In addition, there have been several mysterious, unexplained
extirpations from Okefenokee National Wildlife Refuge, Ichauway Reserve, and Goethe State
Forest.

71.     As a result of the newt's rangewide declines, and the lack of existing regulatory
mechanisms available to protect it, Farmer et al. (2017) found that "newt populations are not
necessarily secure on public lands" and the species warrants federal protections under the
ESA.

### The Striped Newt's Listing History

72.     Recognizing the newt's decline, sixteen years ago, on July 15, 2008, the Coastal
Plains Institute and Land Conservancy petitioned the Service to list the newt as a threatened or
endangered species under the ESA. On June 7, 2011, the Service published a "warranted but
precluded" finding for the species, meaning while it found the newt warranted listing as a
threatened or endangered species, its listing was precluded by those of higher priority. 76 Fed.
Reg. 32911 (June 7, 2011).

73.     The Service determined the newt was warranted for listing under ESA listing
factors A (habitat destruction and modification), C (disease), D (the inadequacy of existing
regulatory mechanisms), and E (other natural or manmade factors affecting the species'
continued existence, e.g., climate change).

74.     The Service stated in its warranted finding that the "primary threats" to the striped newt were habitat loss, disease, inadequate regulatory mechanisms, and drought.

75.     The Service emphasized that "Although droughts are a naturally occurring event in the ecology of the striped newt, prolonged droughts can worsen threats to already small populations and exacerbate the degradation and fragmentation of striped newt habitat that is already taking place … leading to the extinction of striped newts in many areas." 76 Fed. Reg. 32922 (June 7, 2011).

76.     The Service also explained in detail why existing regulatory mechanisms are inadequate to protect the newt, pointing to the absence of protections for newt habitat on private lands and the species' decline on public lands. Notably, when the Service found the newt to be warranted but precluded, the species was still present on multiple public lands it is now extirpated from, such as Goethe State Forest and Ichauway Reserve.

77.     The Service conducted statutorily required annual reviews of the newt's candidate status in 2012, 2013, 2014, 2015, and 2016, each time finding that the species still warranted listing. See 77 Fed. Reg. 70019 (Nov. 21, 2012), 78 Fed. Reg. 70124 (Nov. 22, 2013), 79 Fed. Reg. 72467 (Dec. 5, 2014), 80 Fed. Reg. 80597 (Dec. 24, 2015), 81 Fed. Reg. 87257 (Dec. 2, 2016). The Service did not complete the required annual review for 2017.

78.     Two of the three most recent reviews noted that listing the species could soon be made a higher priority due to ongoing declines on public lands. 79 Fed. Reg. 72467 (Dec. 5, 2014), 80 Fed. Reg. 80597 (Dec. 2, 2015).

79.     In the Service's 2016 annual review for the newt—the last review to have been completed prior to the Service's 2018 not-warranted finding—the Service noted that the newt

had been found in several new locations, including in Florida's Taylor and Osceola Counties. The latter finding expanded the known range of the newt to the south.

80.    Nonetheless, due to the myriad unmitigated threats facing the newt, including loss of native longleaf pine habitat, fire suppression, disease, drought, and the inadequacy of existing regulatory mechanisms, the Service still found the newt warranted listing under the ESA.

## The Service's Not Warranted Determination

81.    On December 19, 2018, the Service published a "not warranted" determination for the striped newt, denying the species ESA protections. 83 Fed. Reg. 65133 (Dec. 19, 2018).

82.    The Service's not-warranted determination was primarily based on a Species Status Assessment ("Status Assessment") dated May 2018 in which the Service discussed threats facing the species and made predictions about its future viability.

83.    The Status Assessment states that the newt's resiliency, i.e., its ability to withstand stochastic events, is moderate with a 60–90% probability of persistence.

84.    The Service did not explain how the agency arrived at its resiliency determination but asserted that populations across the range of the species have persisted through time and are resilient to long-term droughts, and that suitable newt habitat still exists in private and conservation lands, i.e., public lands.

85.    To determine the newt's future viability, the Service developed three future scenarios that considered the species' purported current condition and currently suitable habitat in light of climate change projections and future land use change resulting from urban

development, fire suppression, predatory fish introductions, ORV impacts, and "conservation actions," as well as the likelihood of each scenario's occurrence.

86.    One scenario assumed improved conservation actions such as increased prescribed burning as well as successful and expanded repatriation efforts. All three scenarios assumed the newt can adapt to prolonged droughts and that nearly all vulnerable populations will persist, including Georgia's small, isolated populations and all of the currently extant western ESU populations. All three scenarios also assumed that no additional newt populations on public lands would become extirpated.

87.    To support its finding that the newt is not threatened or endangered throughout all of its range, the Service stated that populations have persisted despite droughts and that under its "most likely" future scenario, not a single population will be lost due to drought or climate change in the foreseeable future.

88.    The Service pointed to the species' existence on public lands, new populations discovered since the species was first found to be warranted for listing, and the repatriation efforts at Apalachicola National Forest, which it stated have successfully "reestablished" populations there.

89.    The Service also stated that while its 2011 warranted finding was based in part on the combined effects of disease and habitat loss due to development and fire suppression, these factors were no longer a threat, and the threats currently impacting the newt were of lower magnitude than previously thought.

90.    Despite stating in the Status Assessment that there are no state or federal regulatory mechanisms that protect the newt's wetland habitats or address climate change, the

Service did not discuss the inadequacy of existing regulatory mechanisms factor when explaining why the newt is not threatened or endangered.

91.     The Service also did not discuss the newt's ongoing declines, even on public lands, nor the significant threats facing the newt across its range, including in the remaining stronghold locations. Nor did the agency address the conclusions of Farmer et al. (2017).

92.     In its Status Throughout a Significant Portion of Its Range ("SPOR") analysis, the Service found that the striped newt is not threatened or endangered throughout a significant portion of its range because there is no concentration of threats in any portion of the striped newt's range at a biologically meaningful scale.

93.     The Service did not discuss the particularly threatened populations in Georgia, nor the western ESU's near-total extirpation.

## FIRST CLAIM FOR RELIEF

### Violations of the ESA and APA

*The Service's Conclusion that the Striped Newt Does Not Warrant Listing Under the ESA is Arbitrary and Contrary to the Best Available Science*

94.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

95.     The Service "shall … determine whether any species is an endangered species or a threatened species" throughout all of its range because of any one or combination of five listing factors. 16 U.S.C. § 1533(a)(1). When doing so, the Service must rely "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

96.     Under the APA, a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary and capricious if the agency entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

97.    The Service's finding that listing the newt as a threatened or endangered species is not warranted violated the ESA and is arbitrary in several respects.

98.    For instance, underlying the Service's not-warranted finding was its assumption that the myriad threats facing the newt are mitigated by the species' existence on public lands.

99.    But as the Service stated in its 2011 warranted finding for the newt, "The precipitous apparent declines now being seen at [Apalachicola National Forest] could occur elsewhere on protected lands within the striped newt's range, despite the protection of habitat." 76 Fed. Reg. 32916 (June 7, 2011).

100.    By concluding that newt populations on public lands are secure, the Service not only failed to explain why its 2011 conclusions regarding public lands were no longer accurate, but also failed to adequately consider a range-wide species assessment, Farmer et al. (2017), that determined listing the newt was warranted and expressly found that "newt populations are not necessarily secure on public lands." Farmer et al. (2017) at 585.

101.    The Farmer (2017) study detailed numerous extirpations that have occurred on public lands and explained that in Apalachicola National Forest, which once contained the second largest metapopulation, extensive surveys have detected the newt in just one pond since 2007 despite seemingly suitable habitat in the areas from which the newt has disappeared.

102.    The study ultimately found that due to the unmitigated threats of fire suppression, habitat loss, silviculture, agriculture, road mortality, ORVs, and climate change impacts such

as drought, the species "faces significant and ongoing threats, *even on protected lands*" and, accordingly, "warrants federal protection." *Id*. at 585–86, 592 (emphasis added).

103.    The Service failed to acknowledge Farmer et al. (2017)'s conclusion, much less grapple with it.

104.    The Service's finding that the newt is secure on public lands, and the agency's concurrent dismissal of key threats that are the cause of ongoing population declines— including fire suppression, silviculture, urbanization, drought, and disease—are therefore arbitrary and capricious and contrary to the best available science.

105.    The Service also failed to explain how the inadequacy of existing regulatory mechanisms is no longer a threat to the newt despite the Service's previous conclusions in the species' 2011 warranted finding and in all five of the species' annual status reviews, including in the most recent status review that reaffirmed the newt's candidate status, that inadequacy of existing regulatory mechanisms is an "imminent" threat.

106.    Specifically, the 2016 review found that "current Federal, State, and local regulations do not protect the vast majority of striped newts or their habitat on private lands," "many regulations do not address management needs of the striped newt" and, overall, "existing regulatory mechanisms are insufficient to reduce or remove threats to striped newts on public and private lands." Species Assessment and Listing Priority Assignment Form: Striped Newt 12 (2016) ("2016 Review") at 23–24.

107.    While the Service acknowledged the inadequacy of existing regulatory mechanisms in the Status Assessment for the newt, the agency did not even mention the threat in its explanation as to why the newt no longer warrants protection. The Service's failure to

explain why this listing factor is no longer a threat to the newt's continued existence renders its not-warranted finding arbitrary and capricious.

108.    Throughout its analysis of the newt's viability, the Service also unlawfully assumed the best case scenario in the face of uncertainty.

109.    For instance, the Service assumed in all three future viability scenarios that the newt will adapt to drought and most other climate change impacts as needed. For example, despite drought indices showing a *significant* trend of increasing drought in the eastern ESU, the Service predicted that the newt will persist across its range with even the most isolated and vulnerable populations remaining extant.

110.    These predictions are contrary to the best available science, which demonstrates that newt populations decline to the point of extirpation as a result of extended droughts even where the species exists in metapopulations.

111.    The Service's rosy conclusions regarding drought impacts also ignore the heightened extinction risk associated with having small, isolated populations separated by unsuitable habitat—a risk that is exacerbated by the ongoing threats of habitat loss, fire suppression, and disease outbreaks.

112.    While there may be some uncertainty regarding the newt's exact response to future conditions, uncertainty does not alleviate the Service of its duty to rely on the best available science. Further, under the ESA, the Service must rationally explain why the uncertainty regarding the impact of a threat, e.g., increased frequency of prolonged drought, favors its listing determination.

113.    Relatedly, the Service relied on unproven conservation measures in making its not-warranted finding. Specifically, the Service asserted that "past conservation efforts,

including captive rearing and release of striped newts, has helped reestablish newt populations in previously extirpated areas, such as [Apalachicola National Forest]." Species Assessment and Listing Priority Assignment Form at 21.

114.    In doing so, the Service unlawfully overstated the success of the repatriation efforts occurring at Apalachicola. At the time the Service made its not-warranted finding, just one first-generation larvae had been found, in one pond. As Farmer et al. (2017) stated, it is "too early to judge the [repatriation] program" at Apalachicola National Forest.

115.    To support its not-warranted finding the Service also pointed to population discoveries that have been made since the species was found to be warranted for listing in 2011.

116.    But it appears that just four new ponds were discovered since the newt's 2016 status review—which considered several new ponds but nonetheless determined the species should remain on the candidate list—was published. *See* 2016 Review at 12 ("Although several new county records have been discovered recently, the overall number of known occupied sites has declined and occupied sites are limited to just a few counties.").

117.    It is still the case that "the overall number of known occupied sites has declined"—indeed, additional extirpations on public and private lands have occurred since the species was first put on the candidate list. Accordingly, the Service's reliance on the discovery of a few new ponds to support its not-warranted finding is arbitrary and capricious.

118.    For these and additional reasons, the Service's not-warranted finding for the newt is contrary to the best available science, dismisses threats that warrant protection, violates the ESA, and is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### Violation of the ESA and APA

#### *The Service's Significant Portion of the Range Analysis Is Unlawful*

119.    The Center realleges and incorporates by reference the preceding paragraphs.

120.    A species is "endangered" if it is "in danger of extinction throughout all *or a significant portion of its range*," and "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all *or a significant portion of its range*." 16 U.S.C. § 1532(6), (20) (emphasis added).

121.    The Service found that the striped newt is not endangered or threatened in a significant portion of its range because the agency found no concentration of threats in any portion of the striped newt's range.

122.    This analysis violates the ESA because it applies the wrong standard. Nothing in the ESA requires that threats be concentrated in a particular area for a species to be threatened or endangered in a significant portion of its range. The statutory standard the Service is required to apply in its determination focuses on the species' conservation status; that is, whether the newt is *endangered or threatened* throughout all or a significant portion of its range. 16 U.S.C. § 1532(6), (20) (emphasis added).

123.    Accordingly, the Service must ask whether there are any portions of the newt's range in which the species' *status* may warrant its listing as threatened or endangered; for instance, whether the newt has suffered or will suffer greater declines in abundance or habitat in a particular portion of its range.

124.    Here, the Service failed to consider in its SPOR analysis the significant difference in the newt's status between the eastern and western ESUs. The eastern ESU contains over

100 ponds, while the western ESU contains just seven. Three of these seven ponds exist in total isolation. In short, the western ESU is on the brink of extinction.

125.    According to Farmer et al. (2017), the "unexplained declines" in the western ESU—declines that have even "been documented on some protected lands"—"have particular significance" because newts in the two regions are genetically distinct.

126.    Even if the Service's "concentration of threats" approach was consistent with the ESA, the Service's SPOR analysis for the newt disregarded the best available science and is undercut by the agency's own findings that numerous threats—including drought, urbanization, the extinction risk associated with having small populations, and the inadequacy of existing regulatory mechanisms—are geographically concentrated within the newt's range.

127.    The Service's determination that the newt is not threatened or endangered in a significant portion of its range is therefore arbitrary and contrary to the best available science.

128.    Accordingly, the Service's not-warranted finding violates the ESA and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## **REQUEST FOR RELIEF**

THEREFORE, Plaintiff respectfully request that this Court:

(1) Declare unlawful, set aside, and vacate Defendants' not-warranted determination for the striped newt;

(2) Remand the not-warranted determination to Defendants for further analysis and order the Service to issue a new listing determination by a date certain that is consistent with the ESA, APA, and this Court's order;

(3) Award Plaintiff reasonable attorneys' fees, costs, and expenses; and

(4) Grant Plaintiff such further and additional relief as the Court may deem just and proper.

DATE: December 12, 2024

Respectfully submitted,

*/s/ Chelsea Stewart-Fusek*
Chelsea Stewart-Fusek (D.C. Bar No. OR0029)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Telephone: (971) 717-6425
cstewartfusek@biologicaldiversity.org

Brian Segee (pro hac vice applicant)
CENTER FOR BIOLOGICAL DIVERSITY
226 W. Ojai Ave., Ste. 101-442
Ojai, CA 93023-3278
Telephone: (805) 750-8852
bsegee@biologicaldiversity.org

*Attorneys for Plaintiff*